860 So.2d 436 (2003)
BULKMATIC TRANSPORT COMPANY, et al., Appellants,
v.
Darryl C. TAYLOR, Appellee.
No. 1D02-1158.
District Court of Appeal of Florida, First District.
August 26, 2003.
*438 David B. Shelton, J. Scott Kirk, and Christopher T. Hill, of Rumberger, Kirk & Caldwell, Orlando, for Appellants.
P. Scott Russell, IV, of Dunlap and Russell, P.A., Jacksonville; Lawrence J. Najem, of Ossi, Butler, Najem & Rosario, P.A., Jacksonville, for Appellee.
LEWIS, J.
Appellants, Bulkmatic Transport Company ("Bulkmatic") and Stephen Farnham, appeal the trial court's order granting appellee, Darryl C. Taylor, a new trial. On appeal, appellants contend that the trial court erred in granting appellee a new trial because the four grounds relied upon by the trial court, both individually and in combination with one another, did not warrant such a result. We agree and, therefore, reverse the trial court's new trial order and remand with directions to reinstate the jury's verdict.
As a result of an accident that occurred on Old Kings Road in Duval County between appellee and Farnham, an employee of Bulkmatic and the driver of Bulkmatic's tractor-trailer, appellee brought suit against appellants. The accident occurred before the tractor-trailer reached the two weight-restricted bridges on Old Kings Road, which has a thirty-five-mile-an-hour speed limit. In Count I of his complaint, appellee asserted that Bulkmatic was vicariously liable for Farnham's negligent operation of the tractor-trailer. In Count II, appellee asserted that Bulkmatic was liable for the negligent hiring, training, and supervision of Farnham. In Count III, appellee asserted that Farnham was negligent in his operation of the tractor-trailer.
Prior to trial, appellee filed a motion in limine in which he sought an order prohibiting appellants from making "[a]ny challenge to opposing counsel to tell the jury why certain witnesses did not testify, or any reference to what uncalled witnesses would have testified to if called," which the trial court granted. Appellee also filed a Motion for Entry of Default Judgment or Other Appropriate Sanctions for Spoliation of Evidence in which appellee alleged that, while he had repeatedly requested "any on board computer data" from the tractor-trailer, appellants had failed to produce any such evidence. Specifically, appellee sought any data from the tractor-trailer's electronic control module, which is otherwise *439 known as the "black box." During the hearing on the latter motion, appellee's counsel stated, "At this juncture, we will concede that the [appellee] can probably go forward with a prima facie case so that... the willful destruction of this evidence will not in and of itselfI'm not going to argue that you should strike the pleading of the [appellants] at this juncture." Appellee's counsel contended that "a rebuttable presumption of negligence shifting the burden to the [appellants] should be held and a jury instruction should be read to the jury," that appellants' comparative negligence defense should be stricken, and that appellants' accident reconstructionist, Stephen Chewning, should be stricken from appellants' witness list. Following both counsels' arguments, the trial court found that Chewning's failure to preserve the black box data exhibited willfulness and bad faith that prejudiced appellee. Because the trial court determined that striking Chewning would be inappropriate under the circumstances and would be "overkill," the court concluded that the appropriate sanction would be to strike appellants' comparative negligence defense. The trial court ruled that it would allow appellee to raise the issue of the black box during the trial and the fact that any data contained therein was not preserved.
Prior to voir dire, appellee's counsel explained to the trial court that Farnham had a multi-year history, beginning in 1995, of not paying attention to Bulkmatic's policies and procedures and that, two weeks prior to the accident at issue, Marty Gribben, Farnham's supervisor, warned Farnham about driving on Old Kings Road with a heavy load. Appellee's counsel also informed the trial court that Gribben had testified in his deposition that Farnham always took shortcuts and that he had a history of driving fast around the terminal. While the trial court initially ruled that it would generally allow this type of testimony, the trial court subsequently ruled that it was only going to allow the one warning given to Farnham by Gribben two weeks prior to the accident. According to the trial court, it believed that its earlier ruling was overbroad.
During voir dire, appellee's counsel informed the prospective jurors that they were going to be instructed that when a professional driver in the employment of his or her company causes harm, the driver's employer would be responsible for that harm. In response, prospective juror Yawn stated that, while he thought that a company is responsible for its employees, he did not know if that is 100% responsibility; it depended upon the situation as to who it was and how much responsibility it was. Prospective juror Vanskoi stated that she did not think that it was fair for a company to be held 100% accountable for the actions of its employees and that she would be uncomfortable applying such a rule. Appellee's counsel then asked the venire whether anyone thought that there had to be some limit on human damages even if he or she was convinced that someone had sustained total damages of two million dollars. Prospective juror Banana stated that it would bother her because of an increase in her insurance rates. Vanskoi stated that her concern was "whether it's more subjective than objective damages." When questioned by appellee's counsel as to whether anyone else had a concern with the subjective versus the objective, prospective juror Riggins replied, "I'd have to go along with that."
In response to appellee's counsel's question as to whether they could apply an analytical framework without limitation to fix what can be fixed and balance what cannot be fixed even if it results in a very large number, Vanskoi stated that she could not do so. Riggins responded, *440 "That's tough for me because I don't know the facts of the case. I don't know what you're going to be telling us. And it would have to be a pretty convincing argument." When specifically asked by appellee's counsel if she would have a problem with rendering a verdict in the amount of one dollar in favor of appellee if she found that he had sustained that amount in damages, Riggins replied, "No, I would not." When asked if she would have a problem with rendering a verdict in the amount of two million dollars if she believed the evidence established two million dollars or more in damages, Riggins responded, "Perhaps." Appellee's counsel then stated, "So we don't actually start out completely on an even playing field, at least in that respect?" Riggins replied, "There are a whole bunch of variables that play typically in one way or another; it's just difficult for me to sit here and tell you that I would have no problem doing that because I don't know that." Prospective juror McDonald also stated that he would have a problem with being responsible for saying something of that magnitude and that he had a problem with holding an employer responsible for the acts of its employees. When appellants' counsel subsequently asked the venire if everyone would be willing to give an award, be it one hundred thousand dollars or three million dollars, if the evidence justified it, the prospective jurors nodded affirmatively. When asked if anyone would be hesitant in giving appellee what he deserved, no prospective juror responded.
Thereafter, appellee's counsel made his challenges for cause. The trial court granted counsel's first challenge for cause as to a doctor who had stated that she had difficulty with the greater weight of the evidence rationale. Counsel successfully challenged McDonald for cause on the ground that he had a problem with large damage awards and with holding an employer responsible for the acts of its employees. Counsel also successfully challenged Banana for cause based upon her statement about her insurance rates. As to Vanskoi, counsel successfully challenged her for cause as she had averred that she had a problem holding an employer liable for its employees' acts and with awarding a large verdict.
With regard to appellee's challenge as to Riggins for cause, counsel contended that, when asked whether the two sides would be starting out on an even playing field, Riggins candidly said no. The court responded that it did not have Riggins saying that in its notes and that, short of that, it thought that she had said that it would be a tough job but that she could do it. After setting forth that the court reporter would attempt to find Riggins' statement and after a brief recess, the trial court denied the challenge as to Riggins for cause. The court also denied two challenges for cause as to Yawn and prospective juror White.
When asked if he wished to exercise any peremptory challenges, appellee's counsel renewed his challenge as to Riggins for cause, which the court again denied. Counsel then utilized one of his peremptory challenges on Riggins, while once again renewing his challenge for cause. According to counsel, he needed to state for record purposes whom he would have used his peremptory challenges on had he received his challenges for cause. Counsel continued that he would have utilized one challenge to remove Yawn and another to remove prospective juror Solano, whose husband had recently passed away and whose son had once driven trucks as his occupation.
During the trial, appellee called two eyewitnesses who testified that Farnham's tractor-trailer crossed the center line and *441 collided with appellee's vehicle. One of these witnesses, Timothy Smith, a UPS driver, testified that he was driving at approximately forty miles per hour behind the tractor-trailer, which had to be traveling at fifty-five or sixty miles per hour. Appellee then played the videotaped deposition of Gribben, wherein Gribben testified that Farnham had been warned or counseled two weeks prior to the accident at issue about using Old Kings Road as a shortcut. Gribben further testified that he had sent Farnham a message that if he got caught going over weight-restricted bridges with a load that was too heavy, he would probably be paying a large fine and be looking for another job.
Appellants subsequently played a portion of Gribben's deposition. When asked if he had said that Farnham was regarded as "something of an icon," Gribben replied, "That's correct." Gribben further testified that "[e]veryone had a high regard for him, yes." Shortly thereafter, appellee's counsel asked to approach the bench, contending that the trial court had previously ruled that any reputation evidence about Farnham would be inadmissible. According to counsel, appellants had placed Farnham's reputation at issue by playing this portion of Gribben's deposition. Appellants' counsel responded that he had shown appellee's counsel the portions he planned to play at trial and that appellee's counsel could have objected at that point. After appellee's counsel explained that appellants' counsel had given "it to [him] before lunch," and that he had gone through the testimony as quickly as possible, the trial court set forth that it would instruct the jury to disregard any testimony about Farnham's reputation but that it would not allow the "other stuff" to be introduced. In response to appellee's counsel's statement that an instruction would reinforce what the jurors had already heard, the trial court asked appellee's counsel if he wanted the court to do nothing or to instruct the jury, to which counsel replied, "Why don't we just leave it alone."
John Murdoch, appellee's consulting engineer specializing in accident reconstruction and forensic engineering, next testified. When asked if he had made any determinations regarding the speed of Farnham's tractor-trailer using engineering principles, Murdoch testified that he calculated the speed at 41.6 miles per hour, which, in his opinion, was a minimum speed based solely upon the length of the skid mark that was present on Old Kings Road. According to Murdoch, the tractor-trailer could have easily reached a speed of fifty miles per hour or more. Murdoch further testified that he believed that the tractor-trailer crossed the center line into appellee's lane of traffic at the point of initial contact.
On cross-examination, Murdoch testified that the major issue in the case was in what lane the impact occurred. When questioned as to whether his speed calculation was based upon his accident reconstruction analysis, Murdoch responded affirmatively. According to Murdoch, he made his evaluation regarding the skid mark from what Farnham had said about his braking prior to the accident. When questioned as to whether there was an accident reconstruction calculation to compute how fast and how hard the tractor-trailer could turn for given speeds, Murdoch responded affirmatively but stated that he had not done those computations. When questioned if he knew how long it would take the tractor-trailer to make a certain maneuver at 41.6 miles per hour, Murdoch replied that he did not know because he had not calculated it in this case. The rest of Murdoch's cross-examination testimony consisted of his opinions regarding the effect of tire and gouge *442 marks on the determination of the impact of the two vehicles, the location of the debris from the accident, the maneuverability of the tractor-trailer, and his animated accident reconstruction.
Appellee subsequently called Steven Rickard, a consultant and instructor in commercial motor vehicle accident investigation and reconstruction, for the purpose of explaining the alleged significance of the black box data to the jury. According to Rickard, the black box provides a printout of the speed of a vehicle when the driver brakes or decelerates at a particular rate of speed in a second; on the box at issue, the deceleration setting was eight miles per hour per second, which would constitute a hard-braking event. According to Rickard, the black box will only store two hard-braking events at a time. When asked if the circumstances surrounding the accident at issue would have qualified as a critical or hard-braking event that would have been recorded, Rickard responded affirmatively. Rickard further testified that the critical event data for the accident at issue was not present when the box was downloaded due to the length of time between the accident and the downloading.
On cross-examination, Rickard testified that he had neither been to the accident scene nor reconstructed the accident. Rickard further testified that the collision itself would not have caused the black box to activate. When questioned as to whether a vehicle traveling at forty-one miles per hour that took 190 feet to stop would result in a hard-braking incident, Murdoch testified that "[i]t may not be. It may be. There's too many variables."
After the close of appellee's case, the trial court directed a verdict as to Count II of appellee's complaint in favor of appellants. Farnham subsequently testified that, as a result of appellee crossing the center line on the day in question, he pulled his foot off of the accelerator, started to the shoulder of the road, and decided just to "cover the brake" for fear of losing control of his vehicle. Farnham further testified that he had been warned about using Old Kings Road when his tractor-trailer was too heavy. According to Farnham, he was making it up to thirty or thirty-five miles per hour when he noticed appellee's van straddling the center line.
Following Farnham's testimony, the trial court set forth that it had looked over appellee's requested jury instructions and was denying such. According to the trial court, the request listed appellee's special requested jury instruction regarding the presumption of negligence for the failure to preserve the black box data. In denying the request, the trial court stated, "I think it goes too far in this case to do that under the circumstances."
Stephen Chewning, appellants' accident reconstructionist, subsequently testified that he flew to Florida two weeks after the accident with equipment capable of downloading black box data. However, because he viewed rolling tire marks at the scene of the accident, which were inconsistent with hard braking, he decided not to download the tractor-trailer's black box data. According to Chewning, if the tractor-trailer's brakes had been applied hard enough to trigger the black box, there would have been furrows in the grass. Chewning testified that he calculated the speed of the tractor-trailer at approximately thirty-five miles per hour. Chewning further testified that, based upon his accident reconstruction, it was absolutely impossible that the tractor-trailer was in appellee's lane at initial contact and then at the point of maximum engagement.
During closing argument, appellants' counsel stated:
Mr. Butler [appellee's counsel] brought up what is called a 2.2 instruction, credibility. *443 You look at the witnesses and you can evaluate them andand you can, and you should do that. There were a lot of witnesses that didn't testify: Dr. Salam, the psychiatrist; Allen Long; the fiancé, Deborah Davis, who was there that day; Tina Shephard, Mr. Taylor's fiancé, and most importantly the plaintiff himself, also.
This is the jury instruction, and the Judge is going to read it, and justit just says that in determining the believability you can look at demeanor, frankness, intelligence, the interest they have in the outcome, the ability to know the facts and remember the facts, and the... reasonableness of the testimony, in the light of all the evidence in the case,.... Andand we didn'twe didn't have the opportunity to do that with these witnesses, and more importantly, Mr. Taylor. Butbut we did have an opportunity to look at the others. And I ask you to apply these criteria to all of them, including Mr. Farnham.
Appellee's counsel made no contemporaneous objection to this portion of opposing counsel's closing argument. Thereafter, the jury found no negligence on appellants' part.
Following the verdict, appellee moved for a new trial, which the trial court granted. In the trial court's Order Granting Plaintiff's Amended Motion for New Trial, the court set forth that the case was a close one that could have resulted in a verdict for either side. According to the court, the ultimate question for the jury's determination was whether the tractor-trailer crossed into appellee's lane of travel. As its first ground for granting a new trial, the court set forth that it previously erred in failing to excuse venire woman Riggins for cause after she gave an indication that she could not be fair to both sides and stated that she could not award two million dollars even if the evidence justified it. Within this finding, the court also set forth that, while appellee did not overtly request an additional peremptory challenge, appellee had stated those peremptories he would have used had he been granted the challenge for cause on Riggins. As its second ground, the court set forth that it previously erred in failing to allow appellee to offer testimony regarding Farnham's driving history with Bulkmatic and that appellants had violated the court's ruling on a motion in limine by introducing evidence that Farnham was a "highly regarded longtime employee who was an icon of the company." According to the court, appellee's evidence would have shown that Farnham continually took shortcuts and repeatedly violated Bulkmatic's company policy. As its third ground, the court set forth that after it found that Chewning, appellants' expert reconstructionist, exhibited willful and wanton behavior in failing to preserve critical black box data, it should have, at a minimum, given appellee's requested jury instruction concerning a presumption of negligence and, perhaps, not have allowed Chewning to testify. According to the court, the significance of the speed and braking issues did not become clear until appellants impeached appellee's expert reconstructionist regarding his guesswork about speed and braking. The court further set forth that, had the black box data not been destroyed, appellee's expert would not have had to guess about the speed and braking. As its fourth and final ground, the court set forth that appellants violated the court's order regarding item number nine of appellee's motion in limine by commenting on the failure of certain witnesses to testify during closing argument. The court concluded that "[t]he above referenced errors, both individually and in combination, were substantially *444 prejudicial to [appellee], who did not receive a fair trial as a result." This appeal followed.
Generally, the granting of a new trial is within the sound discretion of the trial court, which is reversible only upon a showing of an abuse of discretion. Am. Employers' Ins. Co. v. Taylor, 476 So.2d 281, 283 (Fla. 1st DCA 1985). However, if the trial court's ruling is grounded on a question of law, the appellate court is on the same footing as the trial court in determining the correct law to be applied, and the broad discretion rule loses much of its force and effect. Id. In other words, "[w]hen the issue under review is essentially legal, the ruling is not entitled to the broad deference generally afforded a trial court's decision to override a jury's verdict in cases where the court found the verdict contrary to the manifest weight of the evidence." Heckford v. Fla. Dep't of Corr., 699 So.2d 247, 249 (Fla. 1st DCA 1997) (citations omitted). "While it is difficult to categorize any trial error as purely legal, `a trial judge's discretion progressively diminishes as an issue becomes increasingly legal.'" Id. (quoting Tri-Pak Mach., Inc. v. Hartshorn, 644 So.2d 118, 119-20 n. 1 (Fla. 2d DCA 1994)).
Because the trial court in the instant case did not base its new trial order on a finding that the verdict was contrary to the manifest weight of the evidence, but instead based such upon four grounds that are essentially legal in nature, the trial court is not entitled to the broad deference generally afforded to trial courts when they rule on a motion for new trial. See Hartshorn, 644 So.2d at 120-121 (applying a less deferential standard of review in evaluating the trial court's order granting the appellees a new trial based upon the trial court's "four legal rulings," which included two rulings that the court should have given two special jury instructions, a ruling that the court erred by permitting cross-examination of a witness, and a ruling that it erred in prohibiting certain cross-examination of the appellant's medical expert); see also Heckford, 699 So.2d at 250-51 (applying a less deferential standard of review in evaluating the trial court's order in which the court granted the appellee a new trial based upon its finding that the admission of a certain doctor's report constituted error); Sebring Assocs., Ltd. v. Aumann, 673 So.2d 875, 876 (Fla. 2d DCA 1996) (holding that the trial court's discretion in granting a new trial becomes limited when the decision turns on a question of law where the trial court granted a new trial because it found that the jury had been improperly impaneled); Taylor, 476 So.2d at 283 (applying a less deferential standard of review in evaluating the trial court's order in which the court granted the appellee a new trial based upon its determination that the jury had been misinstructed).
As its first ground for granting appellee a new trial, the trial court found that it previously erred in not granting appellee's challenge as to Riggins for cause. Appellants contend that a new trial was not warranted based upon this ground because appellee failed to preserve the issue by not requesting additional peremptory challenges. In Van Poyck v. Singletary, 715 So.2d 930, 931 (Fla.1998), the supreme court concluded that it is reversible error when a challenge for cause is improperly denied, and the defendant then exhausts his peremptory challenges on venire persons who should have been dismissed for cause and a request for additional peremptory challenges is denied. See also Taylor v. State, 796 So.2d 570, 572 (Fla. 2d DCA 2001) (holding that a defendant who challenges his conviction based upon a claim that he was improperly forced to exhaust his peremptory challenges must identify a *445 specific venire person whom he would have removed peremptorily and that the defendant must have requested an additional peremptory strike to remove the objectionable venire person); Hutchinson Island Club Condo. Ass'n v. Degraw, 774 So.2d 37, 37 (Fla. 4th DCA 2000) (reversing an order granting the appellee a new trial and concluding that the denial of challenges for cause argument also failed for lack of preservation as the appellee failed to request additional peremptory challenges); Aumann, 673 So.2d at 876 (concluding that the trial court erred as a matter of law in granting the appellees a new trial as the appellees failed to request additional peremptory challenges once they exhausted their initial compliment of strikes and as they failed to identify the objectionable juror whom they would have stricken peremptorily); Dobek v. Ans, 560 So.2d 328, 329 (Fla. 4th DCA 1990) (noting that in Hill v. State, 477 So.2d 553 (Fla.1985), the supreme court, albeit by dictum, indicated that an appellant must show an exhaustion of all peremptory challenges and a denial of a request for additional challenges and affirming the final judgment because the appellant failed to make a specific request for additional peremptory challenges); Jenkins v. Humana of Fla., Inc., 553 So.2d 201, 202 (Fla. 5th DCA 1989) (holding that its previous decision in Auriemme v. State, 501 So.2d 41 (Fla. 5th DCA 1986), wherein the court held that a party need not seek additional challenges in order to preserve the error resulting from a trial court's improper refusal to grant a challenge for cause, was in direct conflict with Hill and thereby receding from Auriemme to the extent that it was in conflict with its decision).
In contrast to the foregoing decisions, in City of Live Oak v. Townsend, 567 So.2d 926, 927 (Fla. 1st DCA 1990), which appellee relies upon, this Court noted that, because of the responses to the questions asked during voir dire, the appellant's counsel challenged eight prospective jurors for cause in the eminent domain proceeding. Because the trial court denied all eight challenges, counsel used his remaining peremptory challenges to excuse four of those eight prospective jurors. Id. at 927. Before the jury was sworn, counsel unsuccessfully renewed his request that the four jurors, whom he had peremptorily challenged, be excused for cause. Id. According to this Court, a review of the record reflected that each of the eight prospective jurors who were challenged for cause should have been excused.[1]Id. at 928. While noting that counsel did not specifically request additional peremptory challenges "in so many words," this Court determined that, had his renewed challenges for cause towards the four prospective jurors been granted, his peremptory challenges would have been restored and available to challenge the other four venire persons who were seated as jurors. Id. Thus, this Court viewed counsel's "unavailing renewed cause challenges as the functional equivalent of a request for additional peremptory challenges which was denied, thereby entitling him to raise the matter on appeal," and concluded that to hold otherwise would be to embrace form and eschew substance. Id.
Although appellee argues that Townsend is controlling as to this issue, we disagree and find Townsend factually distinguishable from the facts of the instant *446 case. While this case is similar to Townsend, in that appellee's counsel also failed to request additional peremptories and repeatedly renewed his challenges for cause, this case is distinguishable from Townsend, in that, here, the trial court granted four of appellee's counsel's challenges for cause. Furthermore, the trial court properly denied the challenges for cause as to Riggins,[2] as to Yawn, and as to White, an insurance adjuster. Neither Riggins' statement that it would have to be a convincing case for her to award a large verdict nor Yawn's statement that, while he did not know if a company would be 100% liable for its employees, he thought companies are responsible for their employees and that it would depend upon the situation warranted a striking for cause. Moreover, although counsel set forth that he would have used one of his peremptories to strike Solano, whose husband had recently passed away and whose son had driven a truck in the past, such factors would not have warranted a striking for cause either. Thus, there is no indication in this case, as there was in Townsend, that there was considerably more than a reasonable doubt as to the impartiality of the challenged prospective jurors and that such doubt was harmful and manifest to appellee. Therefore, because Townsend is distinguishable from the facts presently before us and because appellee's counsel failed to request additional peremptory challenges, which would have given the trial court the opportunity to either grant or deny the request, we hold that this issue was not preserved. As such, the trial court erred in determining that appellee was entitled to a new trial on this ground. See Degraw, 774 So.2d at 37; Aumann, 673 So.2d at 877.
As its second ground in support of its new trial order, the trial court found that it previously erred in failing to allow appellee to offer testimony regarding Farnham's driving history with Bulkmatic and that appellee's evidence would have shown that Farnham continually took shortcuts and repeatedly violated Bulkmatic's company policy. According to the trial court, appellants violated an order in limine by introducing evidence that Farnham was an icon at Bulkmatic. On appeal, appellants contend that appellee failed to preserve this issue for purposes of a new trial and that, even if the issue was preserved, the irrelevant evidence was introduced during the course of the trial, obviating the need for a new trial.
In support of their argument that appellee failed to preserve this issue, appellants rely upon the Third District's decision in Allstate Insurance Co. v. Hinchey, 701 So.2d 1263, 1264 (Fla. 3d DCA 1997), wherein the Third District reversed the trial court's order granting a new trial because the violation of the motion in limine had been invited and because ample evidence existed to support the jury verdict. There, prior to the trial, the parties agreed to a motion in limine excluding the hospital records that indicated that the appellee consumed four alcoholic drinks on the night of the accident. Id. at 1264-65. When the appellee's counsel cross-examined the appellant's witness and asked if there was anywhere in the records that suggested that the appellee was intoxicated, the witness mentioned the one reference regarding the four drinks. Id. at 1265. Following the jury verdict in favor of the appellant, the trial court granted the appellee a new trial based upon the appellant's witness's testimony. Id. In reversing, the Third District concluded that, not only did the appellee invite the testimony and fail to object to its admission, she also *447 rejected the court's offer to provide a curative instruction. Id. In other words, counsel was gambling that the jury would return a favorable verdict. Id.
In contrast to Hinchey, here, appellee's counsel did not invite Gribben's testimony that Farnham was considered an icon. It was appellants' counsel that played that portion of Gribben's deposition testimony. Moreover, while appellee's counsel did not immediately object to this testimony, counsel did request a sidebar shortly thereafter during which he averred that the testimony placed Farnham's reputation at issue. Cf. Hargrove v. CSX Transp., Inc., 631 So.2d 345, 346 (Fla. 2d DCA 1994) (holding that the appellee's objection was untimely because it was not made until after the jury delivered an adverse verdict). Thus, because the instant case is distinguishable from Hinchey, appellee properly preserved this issue.
Turning to the merits of this second issue, pursuant to section 90.401, Florida Statutes (2000), relevant evidence "is evidence tending to prove or disprove a material fact." "All relevant evidence is admissible, except as provided by law." § 90.402, Fla. Stat. (2000). Section 90.404(1), Florida Statutes (2000), provides that "[e]vidence of a person's character or a trait of character is inadmissible to prove action in conformity with it on a particular occasion," except when addressing the character of the accused, the character of the victim, or the character of a witness. See also Smith v. Hooligan's Pub & Oyster Bar, Ltd., 753 So.2d 596, 599 (Fla. 3d DCA 2000). When evidence of a person's character or a trait of the person's character is admissible, proof of such may be made by testimony regarding the person's reputation. § 90.405(1), Fla. Stat. (2000). Specific instances of conduct may serve as proof of a person's character or a trait of that character when the character or the trait is an essential element of a charge, claim, or defense. § 90.405(2), Fla. Stat. (2000).
As set forth in section 90.404(1), evidence of Farnham's character or a trait of his character, such as violating company policies by continually taking shortcuts, is inadmissible to prove action in conformity with his character on a particular occasion, such as the day of the accident. For example, testimony that a person exceeded the speed limit on a limited number of occasions is not admissible to prove that the person exceeded the speed limit at the time in question. See Charles W. Ehrhardt, Florida Evidence § 404.3 (2002 ed.). However, character evidence in civil actions is admissible when it is relevant and offered to prove an issue other than that the person acted in conformity with his or her character. See id.
The trial court was initially correct when it ruled that only Gribben's warning two weeks prior to the accident would be admissible, as evidence of Farnham's driving history or record would be inadmissible for purposes of proving that he acted in conformity with such on the day the accident occurred. Furthermore, even if the trial court erred in not allowing appellee to introduce evidence to rebut Gribben's icon testimony, a trial court's error in the acceptance or rejection of evidence does not necessarily constitute harmful error. See Midtown Enters., Inc. v. Local Contractors, Inc., 785 So.2d 578, 580 (Fla. 3d DCA 2001). It is only "when a substantial right of the party is adversely affected" that a trial court may grant a new trial on this basis. § 90.104(1), Fla. Stat. (2000); see also Parsons v. Motor Homes of Am., Inc., 465 So.2d 1285, 1290 (Fla. 1st DCA 1985). When a trial court is asked to grant a new trial on the basis of evidentiary errors, the court, in essence, sits as an appellate court and can only reverse itself *448 if the error was substantially prejudicial. Midtown Enters., Inc., 785 So.2d at 580.
In the instant case, the jury was informed several times throughout the trial that Gribben had warned Farnham two weeks prior to the accident not to use Old Kings Road because of the weight restrictions on its bridges. Not only did Gribben testify regarding this warning, Farnham also testified about this warning and that he used a certain route that included Old Kings Road a great deal. With regard to appellee's evidence that Farnham had a history of speeding around the terminal, the jury heard evidence throughout the trial that Farnham was speeding immediately prior to the accident. Timothy Smith, an eyewitness, testified that he estimated that Farnham was traveling at a rate of fifty-five or sixty miles per hour on Old Kings Road, which has a thirty-five-mile-an-hour speed limit. Murdoch calculated Farnham's speed at 41.6 miles per hour, which was a minimum speed, and testified that Farnham could have easily been traveling in excess of fifty miles per hour. Based upon this testimony, any error that the trial court may have made in prohibiting appellee from introducing reputation testimony to rebut Gribben's icon testimony did not substantially prejudice appellee. As such, the trial court erred in reversing itself on this issue. See Midtown Enters., Inc., 785 So.2d at 580.
As its third ground in support of its new trial order, the trial court determined that, after it found that Chewning exhibited willful and wanton behavior in failing to preserve the black box data, it should have, at a minimum, given appellee's requested jury instruction concerning a presumption of negligence and, perhaps, not allowed Chewning to testify, notwithstanding its previous decision to only strike appellants' comparative negligence defense. According to the trial court, the significance of the speed and braking issues did not become clear until appellants impeached Murdoch, appellee's accident reconstructionist, regarding his guesswork about speed and braking. Appellants aver that a new trial was not warranted on this ground because appellee's ability to establish a prima facie case was in no way hindered by the lack of the black box data.
In Public Health Trust of Dade County v. Valcin, 507 So.2d 596, 599 (Fla.1987), the supreme court held that, in order for a court to shift the burden of producing evidence when a defendant causes the negligent loss or destruction of records, a plaintiff must first establish to the satisfaction of the court that the absence of the records hinders his or her ability to establish a prima facie case. See also Jordan v. Masters, 821 So.2d 342, 347 (Fla. 4th DCA 2002) (indicating that a Valcin rebuttable presumption would have been proper had the appellant offered evidence to support the existence of the videotape and had he established that the missing videotape was essential to proving a prima facie case of sexual abuse); Anesthesiology Critical Care & Pain Mgmt. Consultants, P.A. v. Kretzer, 802 So.2d 346, 349 (Fla. 4th DCA 2001) (holding that the Valcin doctrine is applied when, through the defendant's negligence, essential records are missing or inadequate and such absence or inadequacy hinders the plaintiff's ability to establish a prima facie case).
Here, when requesting potential sanctions, appellee's counsel stated, "At this juncture, we will concede that the [appellee] can probably go forward with a prima facie case...." Furthermore, when appellants moved for a directed verdict as to all three counts, appellee's counsel argued that there was "more than sufficient evidence as to the actions of Mr. Farnham on the day of the accident, so that the jury should consider whether or not his actions *449 were negligent." The trial court then denied appellants' motion as to counts one and three. Cf. Palm Beach Roamer, Inc. v. McClure, 727 So.2d 1005, 1007 (Fla. 5th DCA 1999) (holding that a directed verdict is proper where the evidence and reasonable inferences therefrom, considered in a light most favorable to the nonmoving party, fail to establish a prima facie case of the claim asserted). Although appellee asserts on appeal that the adverse jury verdict evidences that his ability to prove liability was severely prejudiced, the adverse jury verdict evidences that appellee failed to prove his case by a preponderance of the evidence, not that he was unable to establish a prima face case.
Moreover, while the trial court found in its new trial order that the significance of the speed and braking issues did not become clear until appellants impeached Murdoch, the trial court denied appellee's request for a presumption of negligence jury instruction after Murdoch testified, setting forth that "I think it goes too far in this case to do that under the circumstances." Yet, interestingly, the trial court subsequently decided, after the jury returned a verdict in favor of appellants, that such a presumption had, in fact, been warranted. The trial court's finding that Murdoch would not have suffered through such a withering cross-examination had the black box data not been destroyed is also erroneous as the issue of whether the black box actually recorded anything on the day of the accident was not conclusively established at trial.
In addition, Murdoch did not testify that the lack of the black box data precluded him from rendering his opinion as to how the accident occurred or in calculating the speed of Farnham's tractor-trailer. Murdoch unequivocally testified that he calculated the speed of the tractor-trailer at 41.6 miles per hour based upon engineering principles. Cf. Hagopian v. Publix Supermarkets, Inc., 788 So.2d 1088, 1092 (Fla. 4th DCA 2001) (holding that the appellant's ability to proceed against the appellee for products liability was hampered as the appellant's expert stated that he could not determine whether a defect was present in the soda bottle, nor could he attribute any defect to mishandling without evaluating the bottle); Sponco Mfg., Inc. v. Alcover, 656 So.2d 629, 630-31 (Fla. 3d DCA 1995) (holding that the appellee's motion for default, a drastic sanction, was properly granted as the appellee's expert convinced the trial court that, in the absence of the crucial evidence, the appellee was no longer able to proceed against the appellant). Therefore, because appellee's ability to establish a prima facie case was not hindered by the lack of the black box data, if any such data existed, the trial court was correct in initially denying appellee's request to give a presumption of negligence jury instruction. The trial court was also initially correct in declining to strike Chewning from appellants' witness list as "the exclusion of a witness' testimony is a drastic remedy which should be utilized only under the most compelling circumstances." Vega v. CSCS Int'l, N.V., 795 So.2d 164, 167 (Fla. 3d DCA 2001) (citations omitted). As such, the trial court's third ground in support of its new trial order did not warrant a new trial.
As its fourth ground in support of its order granting appellee a new trial, the trial court set forth that appellants violated the court's order in limine by commenting on the failure of certain witnesses to testify during closing argument. Appellants' counsel stated:
Mr. Butler [appellee's counsel] brought up what is called a 2.2 instruction, credibility. You look at the witnesses and you can evaluate them andand you can, and you should do that. There *450 were a lot of witnesses that didn't testify: Dr. Salam, the psychiatrist; Allen Long; the fiancé, Deborah Davis, who was there that day; Tina Shephard, Mr. Taylor's fiancé, and most importantly the plaintiff himself, also.
This is the jury instruction, and the Judge is going to read it, and justit just says that in determining the believability you can look at demeanor, frankness, intelligence, the interest they have in the outcome, the ability to know the facts and remember the facts, and the... reasonableness of the testimony, in the light of all the evidence in the case,.... Andand we didn'twe didn't have the opportunity to do that with these witnesses, and more importantly, Mr. Taylor. Butbut we did have an opportunity to look at the others. And I ask you to apply these criteria to all of them, including Mr. Farnham.
Appellants contend that a new trial was not warranted based upon these comments because appellee failed to preserve the issue by not contemporaneously objecting to such and because the comments did not satisfy the four-part test as set forth in Murphy v. International Robotic Systems, Inc., 766 So.2d 1010 (Fla.2000).
In Murphy, the supreme court addressed the issue of what a party must demonstrate to receive a new trial based upon an unobjected-to closing argument. Id. at 1028. According to the supreme court, a complaining party must first establish that the argument was improper. Id. In determining whether an argument is improper, a trial judge must be mindful that the purpose of closing argument is to help the jury understand the issues in a case by "`applying the evidence to the law applicable to the case.'" Id. (quoting Hill, 515 So.2d at 178). Once the complaining party establishes that the argument was improper, it must then establish that the argument was harmful. Id. at 1029. Harmfulness carries a requirement that "the comments be so highly prejudicial and of such collective impact as to gravely impair a fair consideration and determination of the case by the jury." Id. "Passing remarks of little consequence in the scope of a lengthy trial find little sympathy if no contemporaneous objection is voiced." Id. at 1029-30. In other words, "the improper closing argument comments must be of such a nature that it reaches into the validity of the trial itself to the extent that the verdict reached could not have been obtained but for such comments." Id. at 1030. Once the argument is established to be improper and harmful, the complaining party must then establish that the argument is incurable, i.e., that "even if the trial court had sustained a timely objection to the improper argument and instructed the jury to disregard the improper argument, such curative means could not have eliminated the probability that the ... argument resulted in an improper verdict." Id. The final element of the four-part test is that the complaining party must establish that the argument so damaged the fairness of the trial that the public's interest in our system of justice requires a new trial. Id. If the trial court finds that all of these criteria have been met, it must enter an order granting a new trial specifically identifying both the improper arguments of counsel and the actions of the jury resulting from those arguments. Id. at 1031.
On appeal, appellee concedes that the trial court did not find appellants' counsel's closing argument to be incurable or to have so impaired the fairness of the trial that the public's interest in our system of justice required a new trial, the third and fourth elements of the Murphy test. Moreover, appellee does not attempt to establish that the comments at issue satisfied *451 these elements, which, under the facts of this case, would be a futile exercise. Thus, because appellee's counsel failed to object to the comments at issue and because the third and fourth elements of the Murphy test have not been satisfied, the trial court erred in granting appellee a new trial on this ground.
Accordingly, the trial court erred in granting appellee a new trial because the four grounds in support of the trial court's order, both individually and in combination with one another, did not warrant such a result. We, therefore, reverse the trial court's order and remand with directions to reinstate the jury's verdict.
REVERSED and REMANDED with directions.
WOLF, C.J. and POLSTON, J., concur.
NOTES
[1] For instance, juror Johnson made it clear that he had a strongly fixed opinion that a landowner is entitled to something extra if his land was taken against his will and that he would give the landowner something extra even if the judge told him that that would be improper. Id. at 928. The other seven prospective jurors gave similar responses when questioned. Id.
[2] We note that, contrary to the trial court's order granting appellee a new trial, Riggins did not state that she could not award two million dollars even if the evidence justified it.